

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-2-2005

# Reichley v. PA Dept Agriculture

Precedential or Non-Precedential: Precedential

Docket No. 04-3253

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Reichley v. PA Dept Agriculture" (2005). *2005 Decisions.* Paper 191.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/191

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 04-3253

GALEN REICHLEY, t/d/b/a Reichley Brothers Farm;
ALLEN REICHLEY, t/d/b/a Reichley Brothers Farm;
CURTIS STROUP

v.

PENNSYLVANIA DEPARTMENT OF AGRICULTURE;
PENN AG INDUSTRIES; LONGENECKER'S
HATCHERY, INC.; KREAMER FEED, INC.; DENNIS C.
WOLFF; SAMUEL E. HAYES, as Secretary of the PA
Department of Agriculture

Galen Reichley, Allen Reichley t/d/b/a/
Reichley Brothers Farm and Curtis Stroup,
Appellants

On Appeal from the United States District Court
for the Middle District of Pennsylvania
District No. 03-cv-00009
District Judge: Honorable Malcolm Muir

Argued: July 11, 2005

1

Before: Sloviter, McKee, <u>Circuit Judges</u>, and Fullam, <u>District Judge</u>[*]

(Opinion Filed: November 2, 2005)

Alexander H. Lindsay, Jr. **(Argued)**
128 South Main Street
Butler, PA 16001
        *Attorney for Appellants*

Linda S. Lloyd **(Argued)**
15th Floor
Office of Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120
        *Attorney for Appellees Pa Dept. Agriculture, Secretary*
        *PA. Department of Agriculture and Dennis C. Wolff*

Gregory S. Hirtzel
Post & Schell
1857 William Penn Way
P.O. Box 10248
Lancaster, PA 17605
        *Attorney for Appellee Penn Ag Ind*

Sheila A. Haren **(Argued)**

_____

[*] Honorable John P. Fullam, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Post & Schell
1600 JFK Boulevard
Four Penn Center, 13th Floor
Philadelphia, PA 19103
*Attorney for Appellee Penn Ag Ind*

**OPINION**

McKee, <u>Circuit Judge</u>

We are asked to review the District Court's grant of summary judgement in favor of the Secretary of Agriculture for the Commonwealth of Pennsylvania and Penn Ag Industries in this civil rights action brought pursuant to 42 U.S.C. § 1983. Appellants allege that certain actions defendants took in response to an outbreak of avian influenza deprived them of their property "without procedural or substantive due process in violation of the Fourteenth Amendment of the Constitution of the United States." Appellants' Br. at 39. For the reasons that follow, we will affirm.

**I. BACKGROUND**.
**A. Statutory and Regulatory Underpinnings.**

In enacting Pennsylvania's Domestic Animal Law (Act of July 11, 1996, P.L. 561. No. 100, as amended), 3 Pa. CS. §§ 2301-2389, Pennsylvania's General Assembly declared animal health to be of major economic interest in Pennsylvania, and it proclaimed that "it is the . . . policy of the Commonwealth to assure the health and welfare of animals kept in captivity, to prevent and control diseases and dangerous substances that may

threaten the safety of animals and humans, and to provide for desirable management practices for the production . . . of domestic animals." 3 Pa.C.S. § 2302.[1] The Pennsylvania Department of Agriculture (the "PDA"), and more specifically, the Secretary of Agriculture, has authority to implement that policy.

Accordingly, the PDA has the power under the Domestic Animal Law to quarantine animals it reasonably suspects have been exposed to a dangerous, transmittable disease. 3 Pa.C.S. § 2329 (a). The PDA also has the authority to, "condemn and seize or cause to be destroyed, any quarantined domestic animal . . . that has been determined by the Department as having been exposed to a dangerous transmittable disease or hazardous substance such that destruction of the domestic animal. . . is necessary to prevent the spread of such disease or contamination." 3 Pa.C.S. § 2330.

## B. Avian Influenza.

As the District Court explained, "Avian influenza is caused by a type A virus with symptoms that . . . vary from a mild disease with little or no mortality to a highly fatal disease depending on various factors." App. at 9. The viruses are classified into "low pathogenic and highly pathogenic forms based on the severity of the illnesses they cause. Although both demonstrate differing clinical signs in affected birds, both forms

---

[1] "Domestic animals" is broadly defined to include any "animal maintained in captivity." 3 Pa. C.S. § 2303.

4

. . . are highly contagious and have a potentially devastating effect on the poultry industry[,]" *id*., due to the viruses' ability to rapidly spread from flock to flock. App. at 1331

According to the Declaration of Dr. John Enck, V.M.C., Bureau Director for Animal Health and Diagnostic Services of the Pennsylvania Department of Agriculture, low pathogenic avian influenza:

> typically causes little or no clinical signs of illness in infected birds. However, some low pathogenic virus strains are capable of mutating into high pathogenic virus strain [sic] that causes severe clinical signs and high mortality rates in flocks. Therefore, low pathogenic avian influenza is taken very seriously and steps need to be taken to contain the spread of the disease quickly.

App. at 1331.

At his deposition, Dr. Enck described an outbreak of avian influenza that struck the Commonwealth in 1983. He explained that "everyone" wanted to prevent a reoccurrence.

> [T]here were about seven and a half million birds lost. The infection went to high path avian influenza and indemnities paid during that period . . . were close to $63 million, and I guess the total cost to the industry was like $84 million. . . . [I]n other words, it was a very big outbreak.

5

App. at 1273. He characterized the 1983 outbreak as "catastrophic." *Id.* Although he did not know for a fact that the outbreak began as a "low path" outbreak that mutated to a "high path" one, he stated, "that has happened in many of the outbreaks around the world. . . and it is always the biggest fear. . .". *Id.*

According to a report of the Center for Disease Control and Prevention, avian influenza occurs naturally in the intestines of wild birds, and it can be highly contagious and potentially fatal in domesticated animals such as chickens, ducks, and turkeys. Centers for Disease Control and Prevention, *Information about Avian Influenza (Bird Flu) and Avian Influenza A (H5N1) Virus* (May 24, 2005), *available at* http://www.cdc.gov/flu/avian/gen-info/pdf/avianflufacts.pdf.[2] Although the virus does not usually infect humans, it has that potential and does infect humans occasionally.

In order to control the spread of diseases such as avian influenza, the PDA sometimes finds it necessary to "depopulate" diseased poultry.[3] Owners of flocks that the PDA orders depopulated under the Domestic Animal Law are entitled to

---

[2] Last viewed on August 30, 2005.

[3] "Depopulation" appears to be industry jargon for killing or euthanizing a flock. The District Court explained that the term "include[s] quarantining and destroying . . . flocks known to be, or suspected of being, infected with the virus." App. at 10.

6

compensation pursuant to that statute. 3 Pa.C.S. § 2331. Owners of flocks can also be compensated for agreeing to depopulate suspicious flocks in the absence of a formal order from the PDA if there is evidence that the virus is present. This is known as "friendly condemnation." App. at 1273.

The PDA has established procedures for combating and containing an outbreak of avian influenza. App. at 1518-1525. The protocols in place at the time of the outbreak at issue in this appeal may be summarized as follows: (1) once a presumptive diagnosis of avian influenza was made, the PDA was required to order an immediate quarantine, app. at 1518; (2) additional testing would then establish whether or not the preliminary diagnosis was accurate, and whether authorities were really confronted with avian influenza or a similar contagious disease; (3) when certain conditions existed and avian influenza was "confirmed," the flock would be depopulated, and the owner thereby would become eligible to receive compensation in the amount of 67% of the appraised value of the flock, plus compensation for the cost of cleanup and disposal; (4) compensation paid under the Domestic Animal law had to be approved by the PDA.

A diagnosis of avian influenza was deemed confirmed, and the flock was therefore subject to depopulation if tests confirmed:

> Signs suggestive of [avian influenza] and one of
> the following

7

positive virus isolation or sero-positivity and supporting epidemiological evidence, or

[was] positive for any test on surveillance and positive on follow-up virus isolation in samples collected by PDA, PSU or NBC, or

Positive for virus isolation on surveillance and sero-positive on follow-up samples collected by PDA, PSU or NBC.

App. at 1523.

Under the PDA's protocol, a flock could be quarantined if it:

[tested] [p]ositive for any test on surveillance, or

[s]howed [s]igns suggestive of [avian influenza] and [there was] supporting epidemiological evidence, or

[was] sero-positive . . . or

[had] Likely exposure to a confirmed positive flock.

*Id.*

The quarantine would be removed if further testing confirmed that the virus had run its natural course, or if

8

additional testing established that the flock was not actually infected despite preliminary indications to the contrary. *Id.* Additional testing of the contaminated flock to confirm a preliminary indication of avian influenza began only after a four week period, and in large flocks of over 300 birds testing could last several weeks. In the meantime, of course, the owners could not sell the suspicious flock or ship any birds from that flock.

In combating communicable diseases such as avian influenza, the PDA works closely with "stakeholders" in the affected industry "to ensure that the industry will cooperate with the Department to stop the spread of the disease." App. at 1332.[4] This communication and coordination with affected individuals "serves to alert the poultry industry that a threatening virus is prevalent in the Commonwealth; and it encourages biosecurity." *Id*. Dr. Enck testified without contradiction at his deposition that "without industry support, there's no way you can control an infection." App. at 1274. Accordingly, the PDA seeks and requests "logistical support" in imposing quarantines and ordering depopulation. *Id*. The PDA thus solicits the opinion of stakeholders when combating an outbreak such as avian

---

[4] Dr. Enck defined "stakeholders" as "people that have birds in the industry that are affected, that could be affected, by the disease itself." App. at 1268. He defines "'poultry industry' to include any individual, business or other entity who participates in the growing, production, sale, transport or processing of poultry in Pennsylvania." *Id*.

9

influenza, however, Dr. Enck, as the Commonwealth's veterinarian makes the "final decision."[5]

## C. The Reichley Brothers Farm, and the 2001 Outbreak.

Appellants Galen and Allen Reichley, doing business as "Reichley Brothers Farm," produce poultry (particularly chicken broilers) for human consumption. Reichley Brothers Farm acquires much of the poultry it sells by contracting with various poultry farmers who are in the business of raising poultry for sale. Reichley Brothers also sells poultry for distribution via the New York Live Bird Market ("NYLBM") through distributors such as Anthony Campanelli.[6]

---

[5] Although Dr. Enck testified that he makes the "final decision," it is clear from his testimony that he is actually charged with making the final recommendation to the Secretary of Agriculture, "and then the decision is made." App. at 1269. However, the "stakeholders," (here, Penn Ag Industries) tell Dr. Enck "what they think [his] step should be." *Id.*

[6] Customers who shop at the NYLBM are able to observe poultry, select a particular bird, and have it killed, plucked, and eviscerated before purchasing it for consumption. The market relies primarily upon sales to ethnic groups whose members either prefer or require poultry to be killed and prepared in a particular manner before being eaten. According to the District Court, the NYLBM had grown from one main wholesaler twenty-five years ago, to seventy-six registered retailers at the time this suit was filed. App. at 8.

10

Appellants allege specific injuries with respect to four flocks of chickens that had been raised by poultry farmers under contract to Reichley Farms. Although we will briefly set forth the underlying facts as to each of those four chicken flocks, we must begin our discussion with the Ephrata Pennsylvania duck flock since the circumstances surrounding that flock are very relevant to appellants' allegations.

Penn Ag Industries is a trade association that includes farmers and growers involved in the poultry business.[7]

In early December, 2001, the PDA was alerted to the presence of avian influenza in central Pennsylvania on two area farms. A week or two later, James Shirk, Assistant Vice President of Penn Ag Industries, called two meetings of various persons in the poultry industry to discuss options for handling the virus and strategies for handling a contaminated duck flock in Ephrata, Pennsylvania.

---

[7] Penn Ag Industries includes a Poultry Council. It is not clear from the record whether the Poultry Council is a division or subgroup within Penn Ag Industries or if it is comprised of the entire membership of Penn Ag Industries. In their brief, appellants argue that Penn Ag Industries is "involved in lobbying and making political contributions through a political action committee to further the aims of 'agribusiness.'" Appellants' Br. at 15.

Both sides agree that Penn Ag Industries as a trade association that represents stakeholders in the poultry industry.

It is uncontested that Galen Reichley attended the December 18, 2001, meeting that Shirk called to discuss concerns about an outbreak of avian influenza. Penn Ag Industries had been informed that a duck flock in Ephrata had been quarantined after testing positive for avian influenza, but that the owner was refusing to voluntarily depopulate the flock. The PDA had not issued any order to depopulate; therefore, the PDA could not depopulate the flock without the owner's consent. Since the owner would not consent, Penn Ag Industries offered to purchase the flock from the owner using money from an emergency fund it maintained for that purpose, and then depopulate the flock itself rather than risk waiting for the PDA to act. However, the owner refused. The organization therefore could not take any further action with regard to that flock. Accordingly, the flock was never depopulated, and the quarantine remained in effect until the virus passed and test results of the flock came back negative.

### 1. The Rakered Flock.

In order to ship poultry in interstate commerce to get it to a market or a distributor, Reichley Farms had to test blood samples from their flocks on a weekly basis. The samples were submitted to the Penn State Laboratory for analysis.

Deanna Rackered was a poultry grower who raised poultry under contract with Reichley Farms. On December 19, 2001, the day after Galen Reichley attended the Penn Ag Industries meeting and learned that the owner of a quarantined duck flock in Ephrata was refusing to voluntarily depopulate his flock, a report from one of the samples taken from the Reichley

12

flock showed that flock was "suspicious for Avian Influenza virus . . . ."[8] App. at 1350.

The next day, the PDA quarantined the Rackered flock and Dr. David Henzler, a PDA veterinarian and epidemiologist for the Commonwealth of Pennsylvania, collected further blood and tissue samples. The quarantine came at an unfortunate time for Reichley Brothers because the Rackered chickens were raised specifically for Christmas and New Years Eve celebrations and were to be sold at the NYLBM. They were larger than ordinary broilers, and were steadily advancing towards "the end of their projected lifespan in any event." Appellants' Br. 22. These birds had, in fact, been kept longer than poultry is normally kept so that they would attain the larger size that is desirable for chickens that are sold at Christmas and New Years at the NYLBM. Appellants' Br. at 22.

A meeting of Penn Ag Industries was called (apparently at James Shirk's request). Those who attended the meeting reached a consensus to depopulate the Rackered flock. Although Galen Reichley attended this meeting, he did not voice an objection to the consensus of the group. He testified that he did not realize that he could refuse to comply with the decision.

---

[8] In their brief, appellants note that the tests that returned these results are used for preliminary screening and "are the least reliable indicators for Avian Influenza." Appellants' Br. at 21.

13

On December 21, 2001, Galen Reichley received a call from James Shirk and Dr. Bruce Schmucker of the PDA. They informed Reichley that subsequent testing had established that the Rackerd flock was not infected with avian influenza after all. However, since the quarantine had not been lifted, the birds still could not be shipped. According to appellants, "there was no protocol for lifting a quarantine under these circumstances." Appellants' Br. at 22. Moreover, Dr. Schmucker could not tell Reichley when the quarantine would be lifted, saying only that it was "a legal issue."

Since they had no way of knowing if they would be able to ship the flock in time to get it to the NYLBM for the holidays, and since the birds were at the end of their normal lifespan in any event, Reichley Brothers proceeded with the depopulation, and the PDA paid 66 1/3% of the value of the flock ($24,332.62) as well as $2,876 to cover the cost of depopulation and the resulting clean up.

## 2. The Zimmerman Flock and Stroup Flock 1

On January 3, 2002, Galen Reichley took blood samples from flocks on the Zimmerman farm and from a flock on one of Curtis Stroup's farms (this Stroup flock is referred to as "Stroup 1"). Stroup 1 consisted of 13,322 birds and the Zimmerman flock consisted of 7,900 birds. App. at 863. Preliminary tests for both flocks came back positive for avian influenza on January 7, 2002. Almost immediately, the PDA quarantined both farms, and on January 8, 2002, James Shirk called a meeting to discuss the status of both flocks. Once again, a consensus was reached to depopulate the flocks and although

Galen Reichley attended, he again claims that he did not realize he could refuse to depopulate the flocks despite the decision of Penn Ag Industries.

On January 11, 2002, Reichley Brothers destroyed the Stroup 1 and Zimmerman flocks under the supervision of PDA representatives. The PDA again indemnified Reichley Brothers 66 1/3% of the value of the Zimmerman flocks plus compensation for the cost of depopulation and clean up. The PDA also compensated Reichley Brothers in the same amount for the Stroup 1 Flock. On March 29, 2002, the PDA lifted the quarantine of the Zimmerman farm, and on April 19, 2002, the PDA lifted the quarantine of the Stroup 1 Farm.

According to Galen Reichley's declaration, a representative of the United States Department of Agriculture was present when the Stroup 1 and Zimmerman flocks were destroyed and voiced concerns because the flocks looked healthy. Based upon observations of the flock then, the representative purportedly thought that depopulation was not justified. Appellants also claim that a representative of Penn State thought that further testing should be conducted and that depopulation was neither indicated nor justified. Appellants' Br. at 27. However, since the U.S. Department of Agriculture could not "overstep the Pennsylvania Department of Agriculture," Appellants' Br. at 27, and because the birds had already been significantly weakened from having feed and water withdrawn to facilitate depopulation, the depopulation proceeded, and the entire flock was destroyed.

15

After the flock was destroyed, Galen Reichley received a call from Dr. David Henzler, epidemiologist for the PDA, who informed Reichley that subsequent blood tests of both the Zimmerman and Stroup 1 flocks confirmed that they were actually negative for avian influenza.

### 3. Stroup 2 Flock

At the January 8, 2002, meeting, Penn Ag Industries also offered to purchase Curtis Stroup's second flock ("Stroup 2") consisting of 20,000 chickens for $15,000. App. 863, 1156. The PDA would not depopulate that flock because none of the testing indicated that avian influenza was present, and the Commonwealth could not expend funds without any indication that the expenditure of public funds was required. In addition, absent evidence of avian influenza infestation, the PDA would not quarantine the farm housing the Stroup 2 flock.

Nevertheless, the members of Penn Ag Industries who attended were quite concerned about the potential for an outbreak in that flock because it shared a common caretaker with Stroup 1. Thus, the members at the meeting thought that there was a significant risk that the supposed infection from Stroup 1 would eventually spread to Stroup 2. App. at 1516. Accordingly, a roll call vote was taken, and those in attendance decided to purchase Stroup 2 and then destroy it.[9] Galen

---

[9] Penn Ag Industry members who were competitors of Reichley Farms were present at this meeting, but abstained from voting.

16

Reichley and Dr. Enck were both present at this meeting. Reichley once again did not object because he felt "backed into a corner." Accordingly, Reichley Farm sold the flock to Penn Ag Industries for the statutorily defined level of compensation. The flock was thereafter destroyed on January 11, 2001.

## II. DISTRICT COURT PROCEEDINGS.

Thereafter, Reichley Brothers and Curtis Stroup initiated the instant litigation in the United States District Court for the Middle District of Pennsylvania. In their amended complaint they alleged that the PDA improperly delegated its authority under the Domestic Animal Law to Penn Ag Industries and that Penn Ag Industries therefore acted under color of state law to unconstitutionally deprive them of their property. Amended Compl. ¶153-56. The plaintiffs also charged Dennis C. Wolfe, the Secretary of Agriculture of Pennsylvania, in his official capacity. Plaintiffs alleged a violation of procedural and substantive due process and sought prospective injunctive relief. Plaintiffs had initially named the Commonwealth of Pennsylvania, and Samuel Hayes, former Secretary of Agriculture, as defendants. However, the District Court dismissed the Commonwealth pursuant to the Eleventh Amendment. The court also dismissed plaintiffs' claims against Hayes, concluding that they were either barred by the Eleventh Amendment or that he enjoyed qualified immunity.[10]

_____

[10] Appellants' original complaint also included claims against other defendants, including feed suppliers, as well as other federal and state claims. However, appellants do not

Thereafter, the District Court granted summary judgment in favor of Dennis C. Wolff and Penn Ag Industries, and this appeal followed.

## III. DISCUSSION.

Our review of a District Court's grant of summary judgment is plenary. *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 246 (3d Cir. 2002). In reviewing the grant of summary judgement we must view the facts in the light most favorable to the appellants and affirm only when there is no genuine issue as to any material fact so that appellees are entitled to judgment as a matter of law. *Id*. at 247.

The plaintiffs have the burden of establishing liability under § 1983 by a preponderance of the evidence. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law, shall be liable to the party

---

appeal the dismissal of those claims or the claims against those other defendants.

18

> injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Accordingly, there can be no cause of action under § 1983 absent violation of a right secured by the Constitution or the laws of the United States.  The defendant must also act under color of official authority. *West v. Atkins*, 487 U.S. 42, 48 (1988).

## A. Penn Ag Industries Did Not Act Under Color of Law.

Here, even assuming that appellants could somehow establish an unconstitutional taking, the record would still not establish that Penn Ag Industries acted under color of state law. It is undisputed that Reichley Brothers received no written order from the Department of Agriculture directing condemnation of its flocks, nor is there any evidence that the PDA somehow instructed Penn Ag Industries to purchase Stroup 2, or that it instructed the Secretary of Agriculture to impose a quarantine. Rather, the heart of appellants' attempt to find state action lies in their allegation that the challenged actions "were done with the full knowledge and complicity of representatives of the Pennsylvania Department of Agriculture . . .". Appellants' Br. at 7.  Appellants also claim that the PDA delegated authority to Penn Ag Industries in lieu of establishing adequate protocols to address an outbreak of avian influenza.  As we noted earlier, the Commonwealth does have certain protocols in place for when a potential outbreak of avian influenza arises; however, those protocols did not include procedures for determining when to

19

lift a quarantine, or how to expeditiously respond when preliminary test results are subsequently shown to be incorrect or "false positives."[11]

Appellants' 1983 claim therefore rests upon their contention that the state delegated those governmental decisions to Penn Ag Industries and thereby transformed the actions of that private trade association into the actions of the state for purposes of § 1983. *See Biener v. Calio*, 361 F.3d 206, 216 (3d Cir. 2004) (explaining that the Fourteenth Amendment protects individuals only against government action, unless the state has delegated authority to a private party, thereby making the actor a state actor and implicating the Due Process Clause). However, the District Court correctly determined that the record belies

---

[11] Appellants' concern over the lack of specific direction for lifting a quarantine clearly has some legitimacy given the destruction of flocks that were subsequently proven to not have been infected with avian influenza. However, the inadequacy of protocols for responding to infectious disease does not, without more, establish the proverbial "federal case" under § 1983. Moreover, Dr. Enck testified that the Secretary of Agriculture took the position that "subsequent testing doesn't have anything to do with the control of the infection of a highly contagious disease." App. at 1271. "[I]f we had positive avian influenza or suspect cases, we were to depopulate." *Id*.

Nevertheless, defendants state in their brief that, "in light of lessons learned during the 2001-2002 outbreak . . . several of the protocols and procedures have been improved." Appellees' Br. at 13.

appellants' attempts to weave state action from the thread of industry involvement and cooperation with the Commonwealth's efforts to contain and combat this highly infectious disease.

It is undisputed that Penn Ag Industries played a significant role here. As noted above, defendants concede that participation of persons involved in the poultry industry is crucial to controlling outbreaks such as avian influenza. Defendants also concede that industry participation has historically been a basic tenet of the operation of the PDA. However, participation of the stakeholders does not mean that the PDA delegated state authority to them. The Secretary of Agriculture, and only the Secretary of Agriculture, had authority to impose a quarantine or order depopulation. It is clear that, despite his outreach to Penn Ag Industries and the stakeholders it represented, the final decision about quarantine and depopulation rested solely with the Secretary of Agriculture who exercised that authority after considering the recommendation of Dr. Enck, the Commonwealth's veterinarian. As we have noted above, Dr. Enck clearly did seek out Penn Ag Industries' advice and participation, but this record does not support a conclusion that the communication and cooperation is tantamount to a delegation of official authority.

Dr. Enck stated during his deposition, "[w]hatever [Penn Ag Industries] decides, it still winds up that PDA is the end voice that says 'yes, this is what we are going to do.'" App. at 1270. That statement is consistent with the other evidence on this record despite appellants' contentions.

21

Appellants' claim of a constitutional deprivation is further undermined by the fact that Galen Reichley consented to the challenged actions here. Notwithstanding hyperbolic pronouncements that the consent was the product of a "mob atmosphere" and coercion,[12] Galen Reichley clearly knew about

_____

[12] Galen Reichley stated:

> I went to this meeting . . . with 40 people with a noose around our neck. And, you know, do I kick when the bucket's kicked out from under my feet? I don't know. All I . . . said is you guys are going to put me out of business. And they all smiled at each other and walked out of the room.

App. at 1660. The record places Reichley's characterization of the "mob" in its context. Reichley's explanation of this "mob" and the pressure that drove him to depopulate the Zimmerman flock further undermines his attempt to find state action. Reichley explained that one of the people at the meeting was John Martin, whose chicken farm was next to Reichley's. Reichley testified:

> John put pressure on me alone to get rid of these birds, . . . John knew I had a house right next to his house, and he was concerned. *And I have no qualms about John being concerned. I probably would have been concerned too. . . .* [H]e was concerned for the safety of his birds. And he just kept saying, when are you going to gt rid of these

22

the situation involving the Ephrata duck flock. That situation demonstrated that, absent official action by the PDA, Penn Ag Industries could do nothing without the owner's consent. This only confirms that it is the Secretary of Agriculture acting on behalf of the Commonwealth that has the authority to depopulate a flock unless the owner agrees; just as Dr. Enck testified.

Galen Reichley clearly knew that he could wait for the results of more definitive tests for his flocks, but nevertheless agreed to depopulate them in the absence of a formal order from the PDA to do so. He was compensated for all of the birds that were destroyed as well as for costs of depopulation and clean up, and he does not make a serious effort to argue that the compensation was so deficient so as to constitute an unconstitutional taking.

Reichley admitted that he never asked "what will happen if I don't put my birds down," app. at 1660, and a reasonable fact finder could only conclude that he, in fact, knew the answer to that question, despite his assertions to the contrary. It is clear that appellants had a viable option and that they knew as much. Moreover, even assuming that the pressure at the meetings of

_____

> birds. . . I want that house empty in a week's time.
> . . He said just do it as fast as you can get it emptied. . . I don't want no exposure at all. . . . I said, yeah, I'm going to kill them today, John. You know, it was that type of conversation.

Id. at 1661 (emphasis added).

Penn Ag Industries was so great that it somehow negated Reichley's consent, there would still be precious little on this record, other than appellants' allegations, to establish that Penn Ag Industries was a state actor. That is clearly not enough to withstand summary judgment.[13] *See Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 76 (3d Cir. 1998) ("something more than . . . naked allegations [are] required at the summary judgment stage.").

**B.**

Appellants devote a substantial part of their brief to arguing that the District Court erred in relying upon the Declaration of Samuel Hayes, the former Secretary of Agriculture. Appellants' Br. at 42 to 46. Appellants did not originally depose Hayes because he was not a defendant during the initial discovery. It was not until the amended complaint was filed that Hayes and Wolff were included in this action. Appellants' Br. at 42. In granting summary judgment to the defendants, the District Court stated that it, "expressly eschew[ed] reliance upon the Declaration of Samuel Hayes, Jr.

---

[13] We do not, of course, ignore that the PDA did communicate with Penn Ag Industries and seek its input into crucial decisions. As we explain above, defendants admit that such industry involvement plays a crucial role in responding to outbreaks such as avian influenza. However, as we also explained above, the record simply does not support appellants' attempt to "spin" the cooperation and communication into a delegation of state authority.

24

This does not prejudice appellants' claim in any way." Nevertheless, the District Court at times quoted verbatim from portions of Hayes' Declaration. However, any error in doing so was harmless because, even absent Hayes' declaration, it is clear that the PDA did not delegate its authority to Penn Ag Industries, the private trade association was not a state actor, and that appellants agreed to the actions they now challenge.

## D. The Due Process Claim

Appellants' due process claim fares no better. A procedural due process claim requires us to consider three factors: (1) the private interest affected by the official action; (2) the risk that the plaintiff will suffer an erroneous deprivation through the procedure used and the probable value if any of additional procedural safeguards; and (3) the government's interest. *Mathews v. Eldrige*, 424 U.S. 319, 334-35 (1976).

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id*. at 334. It is not disputed that avian influenza endangers the health of poultry sold for human consumption, or that it threatens public health. Nor can it be seriously contended that an outbreak does not require prompt action that includes quarantining suspected flocks to prevent further contamination. To the extent that appellants are insisting upon notice and an opportunity for a hearing before depopulation, the District Court readily and correctly rejected that claim. Due process does not require pre-deprivation notice and hearing where there is an adequate scheme to compensate the property owner for the deprivation.

*See Parratt v. Taylor*, 451 U.S. 527, 543 (1981) (overruled on other grounds by *Daniels v. Williams*, 474 U.S. 327 (1986)); *see also Zinermon v. Birch*, 494 U.S. 113, 115 (1990).[14]

We noted at the outset that appellants also mention a substantive due process claim in their brief. It is not at all apparent that this brief mention is sufficient to raise the issue, nor is it apparent that appellants seriously intended to press that claim. Nevertheless, assuming that appellants are adequately raising a substantive due process claim, it can quickly be disposed of. In *United Artists Theater v. Township of Warrington*, 316 F.3d 392, 399 (3d Cir. 2002) we explained:

---

[14] Appellants have not raised an issue of the adequacy of the compensation in the District Court, and they have only casually mentioned the issue here. *See* Appellant Reply Br. 7. While that claim is included in their amended complaint, that is not sufficient to preserve the issue for appeal. "[P]articularly where important and complex issues of law are presented, a far more detailed exposition of argument is required to preserve an issue." *Frank v. Colt Industries, Inc.*, 910 F.2d 90, 100 (3d Cir. 1990); *see also Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993) ("it is also well settled, however, that casual mention of an issue in a brief is cursory treatment insufficient to preserve an issue for appeal"). If appellants seriously believed that they had a cause of action based upon the amount of the compensation they received, they had an obligation to raise the issue in an appropriate manner to allow the District Court to address it. *See Queen City Pizza, Inc. v. Dominos Pizza, Inc.*, 124 F.3d 430, 444 (3d Cir. 1997).

In *County of Sacramento v. Lewis*, the Supreme Court explained the standard that applies when a plaintiff alleges that an action taken by an executive branch official violated substantive due process. The Court observed that the core of the concept of due process is protection against arbitrary action and that only the most egregious official conduct can be said to be arbitrary in the constitutional sense.

(internal quotation marks and citations omitted). That is so clearly not the situation here that further discussion of the point is not necessary.

## IV. CONCLUSION.

Accordingly, for the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of Dennis Wolff and Penn Ag Industries.